IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| SRINIVAS GINJUPALLI,<br><br>      *Plaintiff,*<br><br>vs.<br><br>CHAMELEON FINANCE, LAKSHMI FINANCE CENTER; SUMMIT FUSION LLC; ELIZIER CO., LIMITED; LUXURY COLLECTION INC; and DOES 1–100,<br><br>      *Defendants.* | Case No. 9:25-cv-00290 |

**PLAINTIFF'S EMERGENCY *EX PARTE* MOTION FOR A TEMPORARY
RESTRAINING ORDER AND EXPEDITED DISCOVERY**

Dated: October 28, 2025

**SBAITI & COMPANY PLLC**

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**George M. Padis**
Texas Bar No. 24088173
**Griffin S. Rubin**
Texas Bar No. 24121809
3102 Maple Avenue, Suite 400
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
    george.padis@sbaitilaw.com
    gsr@sbaitilaw.com

**Counsel for Plaintiff Srinivas Ginjupalli**

# TABLE OF CONTENTS

I.     Background of Pig Butchering Scams ................................................................. 2

II.    Factual Background ............................................................................................ 4

III.   Argument & Authorities .................................................................................... 8

    A.   The Court May Freeze Bank Accounts to Secure Equitable Relief................................... 9

    B.   Plaintiff Satisfies the TRO Standard: Likelihood of Success, Irreparable Harm, Balance of Equities, and Public Interest. ........................................................ 10

    C.   Expedited Discovery Is Warranted to Identify Responsible Actors and Locate Assets. .. 12

IV.   Scope of Requested TRO ................................................................................. 13

V.    Conclusion ....................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*3 Kids, Inc. v. Am. Jewel, LLC,*
No. 3:18-MC-096, 2019 WL 462781 (N.D. Tex. Jan. 15, 2019), *R&R adopted*, 2019 WL 460325
(N.D. Tex. Feb. 6, 2019) .................................................................................................. 9

*Cohn v. Popescu,*
No. 1:24-CV-00337, 2025 WL 1782556 (E.D. Tex. May 29, 2025) ............................................ 1

*De Beers Consol. Mines v. United States,*
325 U.S. 212 (1945) ............................................................................................. 8

*E.E. Maxwell Co., Inc. v. Arti Decor, Ltd.,*
638 F. Supp. 749 (N.D. Tex. 1986) ......................................................................... 9

*Gaponyuk v. Alferov,*
No. 2:23-CV-01317, 2023 WL 4670043 (E.D. Cal. July 20, 2023) ............................................ 1

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
527 U.S. 308 (1999) ..............................................................................................10

*Gucci Am.. v. Bank of China,*
768 F.3d 122 (2d Cir. 2014) ................................................................................. 8

*Harris v. Upwintrade.com,*
No. 1:24-CV-00313, 2024 WL 4920599 (E.D. Tex. Sept. 5, 2024) ................................. 1, 10, 12

*In re Focus Media, Inc.,*
387 F.3d 1077 (9th Cir. 2004) ...............................................................................10

*Jacobo v. Doe,*
No. 1:22-CV-00672, 2022 WL 2052637 (E.D. Cal. June 7, 2022) ............................................ 1

*KCM Fin. LLC v. Bradshaw,* 457 S.W.3d 70 (Tex. 2015) ............................................................ 11

*Leslie v. Starbucks Corp.,*
No. 23-1194, 2024 WL 2186232 (2d Cir. May 15, 2024) ...........................................................12

*Martin-Mercado v. Wells Fargo Bank, N.A.,*
No. 4:23-CV-743, 2023 WL 7105702 (E.D. Tex. Sept. 1, 2023), *R&R adopted*, 2024 WL
3848528 (E.D. Tex. Aug. 16, 2024) ........................................................................ 8

*Meadows v. Bierschwale,*
516 S.W.2d 125 (Tex. 1974) ................................................................................. 11

Tex. Civ. Prac. & Rem. Code § 61.002 ...................................................................... 9

*Texas v. U.S. Dep't of Homeland Sec.,*
747 F. Supp. 3d 1005 (E.D. Tex. 2024) .................................................................. 8

*United States ex rel. Rahman v. Oncology Assocs.,*
198 F.3d 489 (4th Cir. 1999) ................................................................................. 9

*United States v. Colomb*,
    419 F.3d 292 (5th Cir. 2005) ........................................................................12

**Statutes**

Tex. Civ. Prac. & Rem. Code § 61.001 ............................................................. 9

Tex. Civ. Prac. & Rem. Code § 61.003 ............................................................. 9

**Rules**

Fed. R. Civ. P. 64 ............................................................................................. 9

Tex. R. Civ. P. 592 .......................................................................................... 9

## INTRODUCTION

This case arises from a "pig butchering" cryptocurrency scam through which Defendants induced Plaintiff Srinivas Ginjupalli to liquidate his life savings and wire millions of dollars into bank accounts controlled by the perpetrators and their money mules. Plaintiff submits this Emergency *Ex Parte* Motion for a Temporary Restraining Order and Expedited Discovery, without notice, against the individuals and entities operating under the names "Chameleon Finance" and "Lakshmi Finance Center ("LFC")," together with the recipient counterparties and accounts to which the proceeds of fraud were wired, and any persons acting in concert with them (collectively, "Defendants").

Sadly, "pig butchering" and similar cryptocurrency scams have grown increasingly prevalent and sophisticated.[1] Fortunately for the victims of these scams, federal courts have repeatedly acted swiftly to protect victims by granting *ex parte* applications to freeze accounts holding the proceeds of these fraud schemes and expedited discovery to ascertain the perpetrators' true identities.[2] That is precisely the relief sought here.

In addition to the perpetrators, time is the enemy. The speed and fraudulent nature of these scams, coupled here with traditional banking intermediaries used as pass-throughs, create an

---

[1] "One of the most common categories of cryptocurrency investment fraud is known as 'pig butchering,' a highly lucrative billion-dollar industry that has victimized millions of Americans." https://www.secretservice.gov/investigations/investmentfraud-pigbutchering (last accessed Oct. 17, 2025).

[2] *See, e.g.*, *Cohn v. Popescu*, No. 1:24-CV-00337, 2025 WL 1782556, at *4 (E.D. Tex. May 29, 2025); *Harris v. Upwintrade.com*, No. 1:24-CV-00313, 2024 WL 4920599, at *5 (E.D. Tex. Sept. 5, 2024) ("The FBI estimates that in 2023 alone, pig-butchering scammers stole nearly $4 billion from tens of thousands of American victims. . . . The public interest overwhelmingly favors preserving victims' only potential source of recovery through the issuance of preliminary injunctive relief," reasoning "[f]oreign criminal gangs cannot be allowed to steal the life savings from tens of thousands of hardworking Americans with impunity."); *Gaponyuk v. Alferov*, No. 2:23-CV-01317, 2023 WL 4670043, at *3–4 (E.D. Cal. July 20, 2023); *Jacobo v. Doe*, No. 1:22-CV-00672, 2022 WL 2052637, at *6 (E.D. Cal. June 7, 2022).

1

imminent risk of dissipation. Therefore and for the reasons further explained below, the Court should (1) grant a temporary restraining order (TRO) freezing the bank accounts to which Plaintiff was induced by Defendants to wire funds and any other accounts at the subject banks belonging to the customers who received the proceeds from Defendants' fraud, and (2) order targeted expedited third-party discovery to identify the responsible actors and locate Plaintiff's property so that it can be recovered.

## I.    Background of Pig Butchering Scams

"Pig butchering," as the technique is known—the phrase alludes to the practice of fattening a hog before slaughter—originated in China and then went global during the pandemic.[3] These scams are perpetrated by sophisticated criminal syndicates, "often by forcing human trafficking victims in Southeast Asia to perpetrate the schemes against their will."[4] After Chinese financial authorities banned cryptocurrency trading in late 2021, "there appears to be a decrease in Chinese victims and a shift to U.S. and European victims."[5]

These scams are "not only highly organized but also systematized."[6] First, pig butchers create a phony online persona, typically accompanied by an attractive photo displaying an affluent lifestyle. Second, fraudsters send messages to people on social networking sites (e.g., Facebook) and then shift to another messaging service like WhatsApp.[7] Third, pig butchers start a

---

[3] https://www.propublica.org/article/whats-a-pig-butchering-scam-heres-how-to-avoid-falling-victim-to-one (last accessed Oct. 17, 2025).

[4] *Id.*

[5] John N. Griffin et al., *How Do Crypto Flows Finance Slavery? The Economics of Pig Butchering* (Sep. 12, 2025), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4742235)

[6] *See supra* note 3.

[7] https://dfpi.ca.gov/news/insights/pig-butchering-how-to-spot-and-report-the-scam/ (last accessed Oct. 17, 2025).

conversation with the potential victim to gain their trust.[8] Fourth, the swindlers pivot to a discussion about investing, often by displaying screenshots of a brokerage account showing exceptional investment returns.[9] They try to convince targets to open an account at their online brokerage. "Unbeknownst to the target, the brokerage is a sham, and any money deposited will go straight to the scammer. Most victims don't figure out that last part until it's too late."[10]

Fifth, once the victims agrees to learn "investing tricks," the scammers will explain how to wire money from their bank accounts to the fake brokerage.[11] "Typically the fraudster will ease the process by recommending a modest initial investment — which will inevitably show a gain."[12] Step six, "prove" that it's legitimate: the scammers ally doubts by, for example, letting targets "withdraw money once or twice to convince them the process is trustworthy."[13]

Seventh, pig butchering guides instruct scammers how to exploit the victims' "emotional and financial vulnerabilities to manipulate them into depositing more and more funds. It starts with assurances that the investments are risk-free, then escalates into pressure to take out loans, liquidate retirement savings, even mortgage a house."[14]

Step eight, once the target "become[s] unwilling to deposit more funds," "[w]ithdrawals become impossible."[15] Ninth, scammers "turn the screws of manipulation tighter by telling

---

[8] https://www.secretservice.gov/investigations/investmentfraud-pigbutchering (last accessed Oct. 17, 2025).

[9] *See supra* note 3.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

victims there's a potential solution" that only "requires paying additional funds equal to, say, 20% of their total account value" for supposed taxes, fees, or commissions.[16]

## II.    Factual Background[17]

Beginning in April 2025, an individual messaged Plaintiff inviting him to join her group to obtain stock advice.  Decl. of Srinivas Ginjupalli ¶ 2. When Plaintiff joined, another individual using the name "Casey Ross" with an alluring profile picture associated with Defendant Lakshmi Finance Center ("LFC") contacted Plaintiff on WhatsApp. Ginjupalli Decl. ¶ 3; *see id.* Ex. 2 (image of "Casey Ross").

The name "Lakshmi" intrigued Plaintiff, who is an adherent of the Hindu religion (Lakshmi is one of the principal goddesses in Hinduism, "revered as the goddess of happiness, fortune, wealth, [and] prosperity").[18] Ginjupalli Decl. ¶ 3. After initially sending Plaintiff flirtatious messages, "Ross" started providing "trading signals" to buy and sell certain stocks. *Id.* ¶ 4.  After gaining Plaintiff's trust, she induced Plaintiff to open an account at "Chameleon Finance/Chameleon Exchange."[19] *Id.* ¶ 5. Plaintiff underwent a real-seeming "know your customer" or KYC process and set up an account. *Id.* ¶ 6. The website displayed his account information in a manner designed to give the appearance of a legitimate trading platform. *See id.* Ex. 3, Trading Platform Screenshots.

To gain Plaintiff's trust, they initially allowed him to make small withdrawals (under $10,000).  Ginjupalli Decl. ¶ 15. The perpetrators also used purported government documents to

---

[16] *Id.*

[17] The below factual background is supported by the declaration being filed with this TRO motion and the exhibits attached thereto.

[18] https://en.wikipedia.org/wiki/Lakshmi.

[19] https://www.chameleonfinance.com/#/home.

persuade Plaintiff that their investment platform was legitimate. *See id.* ¶ 7; *id* Ex. 4, Screenshots of FinCen Notice and SEC Certificate.  Plaintiff's investigation indicates the SEC Certificate is most likely fabricated, and FinCEN now warns that "**Fraudsters are using the Financial Crimes Enforcement Network's (FinCEN's) money services business (MSB) registration process to defraud the public. You should not trust a company only because it is listed on this Web page**."[20]

Initially, Plaintiff transferred approximately $5,000 at a time from his Robinhood account eventually totaling approximately $100,000. Ginjupalli Decl. ¶ 8. After the Chameleon website displayed substantial (and fictional) profits, eventually, the LFC perpetrators persuaded Plaintiff to deposit funds directly into his supposed Chameleon Finance account from Plaintiff's Bank, SoFi, N.A. *Id.* ¶ 10. The deposits were accomplished through electronic funds transfers from Plaintiff's bank account with SoFi to recipient entities called Luxury Collection Inc.; Summit Fusion LLC; and Elizir Co., Limited, using a supposed third-party wire transfer service called "C2C services." *Id.*

Ultimately, Plaintiff made fourteen wire transfers to Defendants totaling about $3.7 million. *Id.* ¶ 12. Of the $3.7 million, most of the funds were wired to Deutsche Bank Trust Company Americas. *Id.* ¶ 13. Defendants incentivized Plaintiff to make additional transfers using sophisticated social-engineering techniques through which Plaintiff could achieve increasing VIP "status" with LFC. *Id.* ¶ 14; *see* Ex. 5, Social Engineering Screenshot. For example, more than 50 "VIP" members appeared to be members of the WhatsApp group to which Defendants invited Plaintiff.  Ginjupalli Decl. ¶ 14.  These supposed "VIP" members described selling their homes

---

[20] https://www.fincen.gov/msb-state-selector (last accessed Oct. 27, 2025).

and cars to invest more with Chameleon and LFC. *Id.*  On information and belief, the phone numbers were spoofed by Defendants, and the messages were generated either by bots or by the perpetrators—all to help build social proof and gain Plaintiff's trust—a tactic referred to as "sockpuppets." *Id.*[21]

Plaintiff first became alerted to the fraudulent nature of the scheme when he attempted to withdraw funds. *Id.* ¶ 16.  Initially, Plaintiff was able to make small withdrawals of $10,000 or less. *Id.* ¶ 15.  But when he attempted to make larger withdrawals to pay his son's tuition, suddenly the "account" became restricted. *Id.* In late September 2025, Chameleon insisted that Plaintiff make additional deposits to cover certain commissions and service fees and set an arbitrary deadline of October 15, 2025, for Plaintiff to make additional deposits.  *Id.* ¶ 16.  Defendants' conduct raised red flags for Plaintiff. *Id.* After all, why would Chameleon require additional deposits when Plaintiff's account showed a balance of millions of dollars?  *See id.*

After Defendants' September conduct insisting on additional deposits aroused Plaintiff's suspicion, Plaintiff promptly and diligently sought out counsel. *Id.* ¶ 17. Counsel's investigation raised additional red flags. *Id.* The Chameleon website did not publish the terms of service justifying the additional fees or the inability for Plaintiff to withdraw funds from his account. Neither Chameleon nor LFC appears to have a physical location, phone number, or mailing address.  *Id.*  Chameleon's   only   point   of   contact   was   an   email   address: Service@chameleonfinance.com.  *Id.*

---

[21] "Sockpuppets are fake online identities created by individuals or groups to deceive others and manipulate online conversations or activities.  These identities are often used to masquerade(pretend) as real people, with the intention of influencing opinions, spreading misinformation, or carrying out malicious actions without revealing the true identity of the puppeteer." https://cyberunfolded.in/blog/unveiling-the-dark-side-of-sock-puppets-manipulation-deception-and-cyber-threats (last accessed Oct. 27, 2025).

Nonetheless, Plaintiff through counsel sent a demand letter insisting Chameleon either release Plaintiff's funds or provide contractual or regulatory justification for limiting Plaintiff's ability to withdraw funds. *Id.* ¶ 18. Counsel received an email response embedded with basic Chinese characters (for the date and time) that acknowledged Plaintiff's funds were being held "in escrow" but failing to identify contractual terms of service or other legal justification. *Id.* After another unproductive email exchange, counsel grew suspicious that the email responses were being generated by a bot or some other form of generative artificial intelligence. *Id.* ¶ 19. Counsel sent an automated authenticity test, which the email account failed. *Id.* As its response to the verification question, "What's your favorite color?," the email received back was non-responsive and indicative of non-human activity. *Id.*

Chameleon Finance's written response to counsel obscured basic facts, failed to provide a lawful basis for blocking Plaintiff's assets, and attempted to extract additional payments—consistent with "pig butchering" schemes. *Id.* ¶ 20.

Plaintiff sprang into action, through counsel, sending fraud-notice letters to the banks that sent and received wire transfers the very same day Chameleon's support email account failed the bot test. *Id.* ¶ 21. These letters—sent by email and certified mail to the banks that received the fraudulent wire transfers—notified the banks that they were holding proceeds from bank fraud and wire fraud and demanded the immediate reversal of the wire transfers and freezing of the assets in the accounts. *Id.*

This pattern mirrors frauds that have repeatedly warranted TROs freezing assets to prevent dissipation and preserve equitable remedies.

Plaintiff also submitted an IC3 form to the Federal Bureau of Investigations and is

cooperating with law enforcement. *Id.* ¶ 22.

Thanks in part to Plaintiff's prompt action, some wire transfers were successfully stopped. *Id.* ¶ 23. But to date, Plaintiff has not received further responses from the remaining banks or meaningful responses from Chameleon or LFC. *Id.*

Despite these efforts, neither Defendants nor the recipient banks have returned more than $3 million of Plaintiff's funds. *Id.* This lawsuit followed.

### III.    Argument & Authorities

A party seeking a TRO must demonstrate: "(1) a substantial likelihood of success on the merits; (2) a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest." *Martin-Mercado v. Wells Fargo Bank, N.A.*, No. 4:23-CV-743, 2023 WL 7105702, at *1 (E.D. Tex. Sept. 1, 2023), *R&R adopted*, 2024 WL 3848528 (E.D. Tex. Aug. 16, 2024). "Resolution of a motion for a TRO is committed to the equitable discretion of the court and rests on considerations of irreparable injury to the plaintiff without a TRO, the burden to the defendant of a TRO, the public interest, and the probability of plaintiff's ultimate success." *Texas v. U.S. Dep't of Homeland Sec.*, 747 F. Supp. 3d 1005, 1009 (E.D. Tex. 2024).

A preliminary injunction or temporary restraining order can freeze bank accounts associated with Defendants containing the proceeds of fraud. Federal Rule 65 provides for such restraining orders under federal law where as here the plaintiff is "pursuing a claim for final equitable relief [] and the preliminary injunction is ancillary to the final relief." *Gucci Am. v. Bank of China*, 768 F.3d 122, 131 (2d Cir. 2014) (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 219–20 (1945)). While a pretrial restraint against general assets of a defendant to satisfy a

damages judgment is not permitted, when a plaintiff "asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested." *United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999).

A.     **The Court May Freeze Bank Accounts to Secure Equitable Relief.**

Under Federal Rule of Civil Procedure 64, "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). Texas statutory law authorizes prejudgment writs of attachment if "(1) the defendant is justly indebted to the plaintiff; (2) the attachment is not sought for purpose of injuring or harassing the defendant; (3) the plaintiff will probably lose his debt unless the writ of attachment is issued; and (4) specific grounds for the writ exist under Section 61.002." Tex. Civ. Prac. & Rem. Code § 61.001. "Section 61.002 lists nine specific grounds for a writ of attachment, but a plaintiff need only satisfy one." *3 Kids, Inc. v. Am. Jewel, LLC*, No. 3:18-MC-096, 2019 WL 462781, at *2 (N.D. Tex. Jan. 15, 2019) (Ramirez, J.), *R&R adopted*, 2019 WL 460325 (N.D. Tex. Feb. 6, 2019). Writs of attachment may be issued *ex parte*, Tex. R. Civ. P. 592, and "at the initiation of a suit or at any time during the progress of a suit" so long as "a suit has been instituted," Tex. Civ. Prac. & Rem. Code § 61.003. Further, the "validity" of a prejudgment writ of attachment "does not depend on the truthfulness of the allegations of the [requisite] affidavit or the [complaint] but on compliance with the statute in making the affidavit." *E.E. Maxwell Co., Inc. v. Arti Decor, Ltd.*, 638 F. Supp. 749, 752 (N.D. Tex. 1986) (Fitzwater, J.).

In this case, Defendants are (a) not "resident[s] of this state or [are] foreign corporation[s]

or [are] acting as such," (b) "in hiding so that ordinary process of law cannot be served on [the]m," and (c) "has hidden or is about to hide his property for the purpose of defrauding his creditors." Tex. Civ. Prac. & Rem. Code § 61.002(1), (3)–(4). The email responses embedded with Chinese characters and the fact that the fraud scheme bears the hallmarks of a "pig butchering" scam indicate that the perpetrators are most likely members of "[f]oreign criminal gangs." *See Harris*, 2024 WL 4920599, at *5. Plaintiff seeks equitable remedies. including equitable restitution, restoration of the status quo ante, and imposition of a constructive trust over identified property wrongfully obtained and presently detained by Defendants and their agents, including funds held or traceable in the identified recipient bank accounts. Although federal courts lack equitable authority to freeze a defendant's assets prejudgment to secure a legal claim for money damages, *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999), the rule against injunctive relief does not apply to equitable remedies including for fraudulent conveyance and constructive trust where specific property traceable to fraud has been specified. *See In re Focus Media, Inc.*, 387 F.3d 1077, 1084 (9th Cir. 2004). For instance, numerous federal courts have granted *ex parte* injunctive relief in similar circumstances as these involving cryptocurrency scams fitting the "pig butchering" profile.[22] The relief sought here mirrors the interim equitable relief awarded in analogous cases involving theft where the receiving accounts can be identified and frozen to prevent dissipation.[23]

**B.    Plaintiff Satisfies the TRO Standard: Likelihood of Success, Irreparable Harm, Balance of Equities, and Public Interest.**

*Plaintiff will probably succeed on the merits.* The record demonstrates a credible and

---

[22] *See supra* note 2.

[23] *See supra* note 2.

coherent pattern of fraudulent inducement, misrepresentation, conversion, and unjust enrichment. The method of initial contact, style of communications, deceptive tactics, and the nature of the "trading platform" used by the Defendants show that this was a pig-butchering scam. Chameleon Finance and LFC induced deposits and wires while imposing ad hoc, non-contractual withdrawal barriers; demanded additional funds as a precondition to release Plaintiff's own assets; and refused to provide valid contractual documentation or viable, verifiable transaction details. Plaintiff's funds were directed into accounts at Deutsche Bank Trust Company Americas (Elizir Co., Limited), Bank Irvine (Summit Fusion LLC), and TD Bank, N.A. (Luxury Collection Inc.), typical hallmarks of money mule layering. These facts support claims for fraudulent inducement, replevin, conversion, unjust enrichment, and imposition of a constructive trust. A constructive trust may arise "where one party to that transaction holds funds which in equity and good conscience should be possessed by another." *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974); *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015) ("A constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment. They have historically been applied to remedy or ameliorate harm arising from a wide variety of misfeasance." (citation omitted)). The wire proceeds held or traceable at the identified banks satisfy these elements.

*Without a TRO, Plaintiff will suffer irreparable harm.* Without an immediate freeze, Defendants can rapidly dissipate proceeds through domestic and offshore accounts—placing Plaintiff's property beyond reach. Screenshots, correspondence, and bank communications confirm that assets are presently blocked from Plaintiff while Defendants (and their counterparties) remain free to move them. Courts in analogous crypto theft cases have found such dissipation risks to be quintessential irreparable harm warranting a TRO.

*The balance of equities sharply favor Plaintiff.* A TRO preserves the status quo and prevents dissipation of traceable stolen property pending a hearing. Any restraint is temporary and limited to property plausibly subject to equitable relief. By contrast, denial would risk permanent loss of Plaintiff's property to potentially international perpetrators.

*The public interest favors a TRO.* The public has a strong interest in preventing fraud and facilitating the recovery of stolen assets, including through financial institutions. *Harris*, 2024 WL 4920599, at *5 ("The FBI estimates that in 2023 alone, pig-butchering scammers stole nearly $4 billion from tens of thousands of American victims. . . . The public interest overwhelmingly favors preserving victims' only potential source of recovery through the issuance of preliminary injunctive relief"). Federal courts have recognized that freezing proceeds of fraud serves these interests and deters ongoing victimization.[24]

## C.    Expedited Discovery Is Warranted to Identify Responsible Actors and Locate Assets.

This Court retains broad discretion to authorize expedited discovery, particularly in aid of a preliminary injunction or TRO. *See Leslie v. Starbucks Corp.*, No. 23-1194, 2024 WL 2186232, at *5 n.8 (2d Cir. May 15, 2024) (summary order); *accord United States v. Colomb*, 419 F.3d 292, 299 (5th Cir. 2005). Good cause exists here. First, a preliminary injunction is sought, and the discovery is narrowly tailored to the identification of Defendants and the tracing and preservation of Plaintiff's property; it does not reach merits damages discovery. Second, the information necessary to identify the perpetrators and follow the money—the KYC/CIP records, account opening documents, transactional logs, counterparty data, IP/device logs, and related communications—

---

[24] *See supra* note 2.

is within the exclusive possession of non-parties: the receiving banks and any cryptocurrency exchanges or wallet operators used by Chameleon Finance/LFC.  Third, the burden is minimal and familiar to these institutions in fraud recovery contexts, and the requests will expressly exclude any SARs or SAR-referenced materials. Fourth, absent expedited discovery, Defendants' anonymity and the velocity of transfers will frustrate the Court's ability to protect the res. These same considerations led courts in similar crypto fraud cases to grant expedited discovery in tandem with asset-freeze TROs.[25]

Consistent with prior orders in analogous matters, Plaintiff seeks leave to serve narrowly focused subpoenas on the receiving banks (and any downstream institutions identified through recall/return messages) and on any entities associated with customers of the recipient bank accounts that have handled Plaintiff's assets, requesting: (1) KYC/CIP and account identification records; (2) transactional logs, including funding sources, counterparties, and TXIDs; (3) device/IP/session data; and (4) account association/flagging information. This tailored discovery will allow Plaintiff to name the proper defendants, serve process, and refine the asset freeze to the specific accounts and wallets holding Plaintiff's property.

## IV.    Scope of Requested TRO

Plaintiff requests an order that, pending a preliminary injunction hearing:

1.    Defendants, and any person or entity acting in concert with them, are restrained and enjoined from withdrawing, transferring, or encumbering any assets presently held by, for, or on behalf of Defendants, including, but not limited, to:

---

[25] *See supra* note 2.

13

a.     Any digital assets, "contract assets," rewards, or profits held by Chameleon Finance or under its control in accounts associated with Plaintiff (Account No. 800522) and any linked internal or external wallets or exchange accounts;

b.     Funds in the following recipient bank accounts and any sub-accounts or successor accounts holding or receiving funds traceable to Plaintiff's wires: (i) Elizir Co., Limited at Deutsche Bank Trust Company Americas; (ii) Summit Fusion LLC at Bank Irvine; (iii) Elizir Co., Limited at International Bank of Chicago; and (iv) Luxury Collection Inc at TD Bank, N.A.; and

c.     Any other bank, exchange, or wallet accounts identified through recall/return messages, tracing, or expedited discovery as holding or having received property traceable to Plaintiff;

2.     The receiving institutions shall place immediate administrative holds on the identified accounts (and any successor accounts to which related funds were transferred) in amounts sufficient to preserve property traceable to Plaintiff's wires, and shall preserve all records and data relating to such accounts and transactions, including KYC/CIP, account statements, wire/ACH/Fedwire/SWIFT messages, IP/device logs, and internal alerts or notes;

3.     Chameleon Finance shall immediately preserve and produce, on an expedited basis, the terms governing Plaintiff's account, all communications with Plaintiff or

LFC, complete account and "contract" ledgers, and all TXIDs and counterparty data for any transfers into or out of Plaintiff's account(s), and shall release and transfer Plaintiff's balances either to Plaintiff's designated wallet(s) or to counsel's IOLTA, absent a documented, lawful basis to withhold.

## V.    Conclusion

Plaintiff has demonstrated a strong likelihood of success on the merits, the probability of irreparable harm absent immediate relief, that the equities favor preserving the status quo, and that the public interest supports intervention to halt ongoing fraud and secure recovery of stolen assets. The Court should enter the requested TRO without notice, grant narrowly tailored expedited discovery, and set a prompt hearing on a preliminary injunction.

Respectfully submitted,

Dated: October 28, 2025                    SBAITI & COMPANY PLLC

                                           */S/  George M. Padis*
                                           **Mazin A. Sbaiti**
                                           Texas Bar No. 24058096
                                           **George M. Padis**
                                           Texas Bar No. 24088173
                                           **Griffin S. Rubin**
                                           Texas Bar No. 24121809
                                           3102 Maple Avenue, Suite 400
                                           Dallas, TX 75201
                                           T: (214) 432-2899
                                           F: (214) 853-4367
                                           E: mas@sbaitilaw.com
                                             george.padis@sbaitilaw.com
                                             gsr@sbaitilaw.com

                                           **Counsel for Plaintiff Srinivas Ginjupalli**

## NOTICE OF SEALED EXHIBITS

Certain exhibits have been filed under ex parte seal under to Local Rule CV-5(a)(7).

## *EX PARTE* CERTIFICATION

My name is George Monroe Padis. I am an attorney licensed in the State of Texas. All facts stated in this certification are within my personal knowledge and are true and correct. I am over twenty-one years of age and reside in the state of Texas. I have never been convicted of a felony or other crime of moral turpitude. I am competent to make this certification.

Federal Rule of Civil Procedure 65(b)(1)(B) requires that I certify "in writing any efforts made to give notice and the reasons why it should not be required." No effort has been made to give notice to Defendants. *See* Fed. R. Civ. P. 65(b)(1)(B). The financial institutions with which the account numbers involved in the fraudulent transfers as to Plaintiff have been contacted, however, each by letter dated September 30, 2025.

Notice is neither necessary nor should be required for two crucial reasons. First, the true identities of Defendants are either (i) only known as to the entity names but not the people operating those entities, or (ii) are unknown at the present time. Notice cannot, as a practical matter, be necessary when the recipient of the notice is unknown or indeterminate at the time notice would otherwise be required. Second, attempts to contact Defendants—those who executed or otherwise worked to execute the pig-butchering scheme at issue—will prompt Defendants to dissipate any remaining assets from the accounts involved in the perpetrated fraud to make such funds wholly unreachable. Providing Defendants notice will all but guarantee Plaintiff's inability to recover the funds Defendants swindled from him.

16

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 28, 2025.

/s/ George M. Padis
George M. Padis